**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Albert W. KILLIAN,
Defendant-Appellant.**

No. 75–4011.

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1976.

---

**1158**

William C. Andrews, Gainesville, Fla., J. Robert McClure, Jr., William C. Owen, Tallahassee, Fla., for defendant-appellant.

Nicholas P. Geeker, Stewart J. Carrouth, Asst. U. S. Attys., Melvin R. Horne, Tallahassee, Fla., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and GEE, Circuit Judges.

GEE, Circuit Judge:

Appellant Killian was indicted on September 15, 1975, for sixteen separate acts of abstraction and misapplication of bank funds in violation of 18 U.S.C. § 656 (1970).[1] The jury found him guilty on all sixteen counts on October 9, 1975. Killian was thereafter given concurrent two-year sentences on each of the sixteen counts on the condition that after six months of confinement the remainder of the sentence would be suspended and Killian placed on supervised probation for three years. He also was fined $1,000 for each count, for a total of $16,000. Killian now appeals, raising points concerning sufficiency of the evidence, trial court limitations of direct and cross-examination of witnesses, prosecutorial summation and severity of sentence. We affirm.

The sixteen transactions in question occurred between September 18, 1972, and January 9, 1973, as parts of a float scheme between Killian's several accounts in the Bank of Hawthorne, of which he was a director and 43% shareholder, and his account in the Citizen's Bank of Gainesville.[2] As director and plurality shareholder, Killian had access to the bank's physical plant via his own key and the assistance—quite crucial to the success of his scheme—of the president of the bank, William Burchette. On each day when one of the transactions took place, Killian entered the bank before working hours (using his own key) and received from the bank's bookkeeper—Delia Burchette, the wife of William Burchette—an adding machine tape indicating how much money was in one of his several accounts.[3] Armed with this

---

1. The indictment was Killian's second, his first trial having resulted in acquittal of nine counts of causing false entries to be made and a mistrial, due to a hung jury, on nine courts of misapplication in violation of § 656. The indictment which served as the basis for the instant proceedings renewed the nine mistried counts of abstraction or misapplication and added seven more.

2. In one of the sixteen transactions Killian apparently used his account in a bank in Palatka rather than the Citizen's Bank; for simplicity, we will discuss the scheme as if the Citizen's Bank were always the second bank.

3. He maintained accounts at the Hawthorne Bank for at least three businesses as well as a personal account in his and his wife's names.

knowledge, he proceeded to William Burchette's desk to purchase one or more cashier's checks in amounts ranging, on all but one occasion, between $19,800 and $26,000. In payment for the cashier's check he gave two personal checks, which we will call the "primary" check and the "second" check. The primary check was drawn on one of Killian's accounts at the Bank of Hawthorne, invariably on insufficient funds,[4] in the amount of the cashier's check being purchased. The second check was drawn on Killian's account at Citizen's Bank,[5] in an amount equal to (or perhaps slightly greater than) the primary check, to "cover" the primary check. Both personal checks were given to Burchette with the understanding that they were to be held in his desk until the cashier's check was returned to the bank for payment, usually three of four days later. Killian then deposited the cashier's check in his Citizen's Bank account before two o'clock that same day. In a few days[6] the cashier's check would clear banking channels and be returned to Hawthorne for payment. Intercepting it, Burchette would finally fill in the date on Killian's Citizen's Bank check and deposit it to Killian's Hawthorne account, send the now-good primary check to the bookkeeping department of his bank for processing and record the cashier's check in the bank's general ledger.[7] The effect of these machinations was that Killian's Citizen's Bank account reflected, for three or four days, funds equal to the face value of the cashier's check, even though the outstanding check on that account reposing in Burchette's desk would have wiped out that favorable entry if processed normally.[8] Killian thus arranged with Burchette's assistance his own line of short-term credit, free of the accompanying nuisance of the interest charge which others in less favored positions would pay. Since all of Killian's checks were eventually paid, the sole loss sustained by the Bank of Hawthorne was this interest-free use of its money.

### Sufficiency of the Evidence

Appellant first contends that, the evidence being insufficient to establish the requisite willful misapplication of bank funds with intent to injure and defraud the bank,[9] his motions for judgment of acquittal and later for a new trial both merited favorable rulings. Neither the phrase "willfully misapplies" within § 656, nor its counterpart, "intent to injure and defraud," read into § 656 by the courts,[10] necessarily connotes an evil desire or a motive of causing injury. Deliberate misapplication of bank funds suffices, even if—as is surely the norm—the actor is motivated purely by his own self-interest or that of another and

---

4. The September 18, 1972, check, for example, was in the amount of $19,800; testimony established that the account on which it was drawn contained $81.91 on that date.

5. *See* note 2, *supra.*

6. The September 18 cashier's check, for example was returned to Hawthorne on September 22.

7. Cashier's checks normally were credited on this general ledger *when issued*, with the resulting credit balance reflecting the bank's liability on the check. Failure to record the check when issued meant that bank records failed to show an outstanding liability; subsequent payment of the check before Burchette recorded it caused the general ledger to improperly show a debit balance rather than the normal credit balance indicating bank liability on issued and outstanding cashier's checks.

8. Testimony showed that in one of the transactions—on December 8, 1972—the primary and second checks were apparently, and inexplicably processed on the same day the cashier's check was issued. The result was an overdraft of $32,875.50 in Killian's Bank of Hawthorne account.

9. The elements of a violation of 18 U.S.C. § 656 (1970) are:

   (1) [T]hat the accused was an officer, director, etc. of a bank, (2) that the bank was connected in some capacity with a national or federally insured bank, (3) that the accused willfully misapplied the money, funds, etc. of said bank, and (4) that the accused acted with intent to injure and defraud said bank.

   *United States v. Mann,* 517 F.2d 259, 267 (5th Cir. 1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). Elements (1) and (2) were undisputed in the instant case.

10. *Ibid.*

wishes no harm to anyone. We have held that the term "willful" means only that the actor knows and intends what he is doing. *McBride v. United States,* 225 F.2d 249, 254 (5th Cir. 1955), *cert. denied,* 350 U.S. 934, 76 S.Ct. 306, 100 L.Ed. 816 (1956).[11] We have also noted, without necessarily approving, the definitional gloss given by other courts to the intent requirement implied in § 656. *United States v. Wilson,* 500 F.2d 715, 720 (5th Cir. 1974), *cert. denied sub nom. Levin v. United States,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975); *Williamson v. United States,* 332 F.2d 123, 134 n. 16 (5th Cir. 1964). We find ourselves in agreement with the rule that the government, in prosecuting under § 656, proves the requisite intent to defraud and injure by showing "an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank." *United States v. Tokoph,* 514 F.2d 597, 604 (10th Cir. 1975); *Galbreath v. United States,* 257 F. 648 (6th Cir. 1918). Tested by that standard and viewing the evidence in the light most favorable to the government,[12] we cannot conclude that the trial court erred in denying appellant a judgment of acquittal or a new trial.

■ The evidence presented by the government included, *inter alia,* sixteen exhibits, each of which contained, for the transaction in question, the cashier's check, Killian's two personal checks (the primary and second checks), and the bank statement tending to show that the primary check was written on insufficient funds. Although a number of witnesses testified, undoubtedly crucial to the government's case was Burchette's testimony that appellant Killian instructed him to hold Killian's personal checks until the cashier's check was returned for payment. Understandably, then, damaging Burchette's credibility constituted a major portion of Killian's defense at trial. Nevertheless, the jury, entrusted with finding the facts, apparently chose to believe Burchette's testimony, and Killian's alternative explanation [13] did not raise a reasonable doubt in their minds. The evidence before the jury was sufficient to justify their verdict.

■ Killian also claims that improper summation by the prosecutor assisted the jury in reaching a guilty verdict on insufficient evidence. The gist of the argument complained of was that the exhibits alone could establish Killian's guilt—that the jury need only find that Killian knew when he wrote his checks that his accounts contained insufficient funds.[14] We cannot find reversible error in the argument, nor any indication that the jury was thereby led into an erroneous verdict, for several reasons. First, no reported decisions—in this or other circuits—preclude the drawing of a permissive inference of intent to injure and defraud from a practice of writing checks on insufficient funds.[15] What is prohibited

11. In the context of a § 656 violation, *see also United States v. Mullins,* 355 F.2d 883, 887 (7th Cir.), *cert. denied,* 384 U.S. 942, 86 S.Ct. 1465, 16 L.Ed.2d 540 (1966):

   We think the court did not err . . . in defining "wilfully" to mean "that the act was committed voluntarily, with knowledge that it was prohibited by law, and with the purpose of violating the law, and not by mistake, accident, or in good faith."

12. *Montoya v. United States,* 402 F.2d 847, 850 (5th Cir. 1968).

13. Appellant Killian testified that the cashier's checks were purchased to cover the substantial short-term capital needs of some automobile businesses he owned, that he always believed that his Citizen's Bank account contained sufficient funds to cover his second check, that he purchased the checks in this manner simply to reflect the transaction in the appropriate business account at Hawthorne, and that, on each occasion in question, the contemplated deal fell through in time for him to deposit the cashier's check in his Citizen's Bank account by the close of the business day.

14. "Now, it's our position that you don't have to believe [Burchette] to find the defendant guilty.

   "The documents show the insufficiency of the checks offered by the defendant and the defendant, Killian testified from the stand that he knew at the time he gave those checks, that they were insufficient and that is all you need to find."

15. Cases cited by appellant expressly permit this inference. *See, e. g., Benchwick v. United States,* 297 F.2d 330, 333 (9th Cir. 1961):

   The repeated drawing and payment of checks over an extended period in amounts grossly in excess of the defendant's balance was itself a relevant circumstance bearing upon defendant's knowledge and intent.

is a *conclusive* presumption—a finding of guilt *as a matter of law*, taking the case from the jury once the fact of drawing checks on insufficient funds is proven. *Benchwick v. United States,* 297 F.2d 330, 333 n. 5 (9th Cir. 1961); *Dow v. United States,* 82 F. 904, 908 (8th Cir. 1897). The prosecutor's argument did not approach asserting such a conclusive presumption. Second, the trial court's instructions to the jury did not mirror the allegedly erroneous argument. Finally, Killian failed to object to the argument when it was made.

### Limitation of Cross-Examination of Burchette and Contradiction of His Testimony

■ Burchette pled guilty to aiding and abetting Killian in his float scheme. The limitation of cross-examination is normally a matter within the discretion of the trial court, *Ford v. United States,* 233 F.2d 56, 61 (5th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53 (1956), so long as the sixth amendment right of confrontation is satisfied. *United States v. Bass,* 490 F.2d 846, 857–58 n. 12 (5th Cir. 1974). Although the need for careful scrutiny of accomplice testimony [16] suggests a greater solicitude for the defendant's right of cross-examination of such testimony, we have no trouble concluding that the trial court neither abused its discretion nor denied the right of confrontation in this case. The limitation complained of occurred when Killian's counsel attempted to follow up on Burchette's statement that he went along with Killian's float scheme for fear of being terminated if he did not. Killian wished to place before the jury his theory that Burchette effectively framed Killian by withholding the personal checks on his own volition, creating the appearance of a deliberate float, in order to gain leverage in the event Killian discovered Burchette's kiting and wished to have him terminated by the board of directors. The proper time to present this alternative theory was in argument to the jury, as Killian's counsel recognized by including it in his summation. In cross-exam-

ination, counsel had already obtained Burchette's admission that firing him would necessitate firing Killian if Killian appeared to be engaged in kiting checks; when counsel attempted to go further by restating the admission in an argumentative manner, the prosecutor's objection was properly sustained. Further, the utility to the defense of continuing cross-examination on this matter—beyond having an early opportunity to argue to the jury—seems negligible; Burchette could hardly be expected to admit outright that he framed Killian when his testimony had been that he participated unwillingly in Killian's scheme. The court correctly sustained the objection.

■ Killian further complains of the court's refusal to allow testimony by an F.D.I.C. examiner, Thomas Billings, concerning a company called C.B.K. Enterprises. Burchette had earlier denied that he owned C.B.K. Enterprises or that loans to the company, while Burchette was bank president, were fraudulently made. Killian's counsel wished to establish, from Billings' testimony, that Burchette did indeed own C.B.K. and thus erode Burchette's credibility while establishing further illegalities in bank operations which Burchette was obliged to cover up. Any contradiction elicited from Billings would have been cumulative, since on this matter, as on several others, there was no shortage of contradictory testimony. Burchette himself admitted that the initials C.B.K. were those of his three children; witness Ora Lee Spence, the plant supervisor at C.B.K., testified that her only boss was Burchette, that he organized the company, that C.B.K. stood for the names of Burchette's children, and that when inquiries were being made into the nature of the company Burchette instructed her to tell questioners that C.B.K. stood for the names of her grandchildren and that, as of an earlier date, all of the company's stock had been transferred to her. In these and other respects counsel had adequate opportunity to discredit Burchette and illustrate the nature of his dealing with bank funds; we are

---

16. *Williamson v. United States,* 332 F.2d 123, 131 (5th Cir. 1964).

unable to conclude that the court abused its broad discretion in such matters by sustaining an objection to further testimony by examiner Billings.

*Government's Analogy in Summation and Severity of Sentence Imposed*

 Appellant's final two points concern the prosecutor's use of an analogy in jury argument and the disparity in the sentences given him and Burchette. In his summation, the prosecutor analogized Killian's conduct to that of a store clerk's removing money from the cash register overnight and replacing it the next morning. Killian argues that allowing the analogy constituted prejudicial error because it suggested the crime of embezzlement, a distinct crime from the misapplication charged here, and because it did not clearly indicate that intent to injure and defraud is an element of a § 656 violation. Weighing the degree to which the argument may have affected Killian's substantial rights, *United States v. Rhoden,* 453 F.2d 598, 600 (5th Cir.), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972), we find little, if any, effect and no error. An analogy used by the prosecutor in closing argument need not parallel the charged crime in every minute detail. Here the point being made was that the crime may be committed even if, as in the instant case, no visible loss was sustained by the "storekeeper," the Bank of Hawthorne. The analogy need not also contain, in addition, an instruction concerning the requisite state of mind, nor, for that matter, the requirement that the bank be federally insured or that the defendant be an officer or director. Further, the trial court took the precaution of instructing the jury that the analogy might contain some elements not entirely appropriate to the crime with which Killian was charged. We do not review arguments with the same type of scrutiny we would give an indictment; we cannot visualize prejudice resulting from the mere fact that the analogy, if reduced to elements for which it was not offered, is more nearly one of embezzlement than misapplication.

 Finally, Killian asks us to review and correct the severity of the sentence given him. Assuming without deciding that we have such powers, we note that having been convicted on all sixteen counts, Killian could have been sentenced to a maximum of eighty years imprisonment (in consecutive five-year sentences) and fined a total of $80,000. 18 U.S.C. § 656 (1970). Instead, he was sentenced to six months incarceration and three years probation (sixteen concurrent sentences) and fined $16,000. The total sentence being a mere fraction of that authorized by the statute, the trial court did not abuse the sentencing discretion committed to it. *United States v. Moore,* 427 F.2d 38 (5th Cir. 1970).

AFFIRMED.